FILED
2026 Apr-28  PM 04:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **J. CORBIN DOUGLAS TUNSTALL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:24-cv-01504-RDP** |
| | } | |
| **ALABAMA DEPARTMENT OF CORRECTIONS,** | } | |
| | } | |
| | } | |
| **Defendant.** | } | |

<u>**MEMORANDUM OPINION**</u>

Before the court is Defendant Alabama Department of Corrections's Motion for Summary Judgment. (Doc. # 43). The Motion has been fully briefed. (Docs. # 44, 48, 49). After careful review, and for the reasons discussed below, Defendant's Motion is due to be granted.

**I.      Background[1]**

In January 2013, Defendant Alabama Department of Corrections ("ADOC") appointed Plaintiff J. Corbin Douglas Tunstall ("Plaintiff"), a Black male, to serve as a Correctional Officer Trainee in the William E. Donaldson Correctional Facility ("WEDCF") in Bessemer, Alabama. (Doc. # 41-1 at 4). Effective June 1, 2013, Plaintiff was appointed as a Correctional Officer at WEDCF, and on December 1, 2020, he was promoted to Correctional Sergeant at that same facility. (Doc. # 41-1 at 2-3). As a condition of his employment, Plaintiff took an oath to faithfully execute his duties, comply with all rules and regulations governing the treatment of inmates, and refrain from mistreating, abusing, or imposing any punishment beyond what those rules and

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

regulations permitted. (Doc. # 41-1 at 11).

Under Alabama law, the Commissioner of the ADOC serves as the ultimate decision-maker and appointing authority. *See* Ala. Code § 14-1-1.3; Ala. Admin. Code r. 670-X-3-.01(a)(5). Jefferson Dunn held the Commissioner position at the time of the underlying incident, while John Hamm had assumed the role by the time of Plaintiff's separation from state service. (Docs. # 41-5 at 1; 41-1 at 1).

On August 18, 2021, Correctional Captain LaTonya Scott sent an email to supervisors at WEDCF conveying Correctional Warden Gwendolyn Givens's directive that "no inmates [were] to be placed in the barbershop following an incident in which they [had been] involved," and that failure to comply would result in "corrective action." (Doc. # 41-2 at 2). Plaintiff acknowledged receipt of this directive by replying, "10-4." (*Id.* at 1).[2]

### A.    The October 11, 2021 Incident and ADOC's Investigation

On October 11, 2021, inmates Kenneth Gilchrist and Dezra Tellis were involved in an altercation in Y-Unit. (Doc. # 41-5 at 5). Inmate Tellis stabbed Inmate Gilchrist. (*Id.*). Inmate Gilchrist died, but only after he was not given medical care for an extended period of time. (*Id.* at 5, 17-19). Correctional Officer Edward Martin, who was assigned to Y-Unit, radioed for a wheelchair to transport Inmate Gilchrist to the Healthcare Unit ("HCU"). (*Id.*) Inmate Gilchrist had reportedly been behaving erratically throughout the night. (*Id.*).

### 1.    Security Footage from the HCU

ADOC's Law Enforcement Services Division ("LESD") reviewed security camera footage from the HCU. (Doc. # 41-6). The video begins at approximately 00:00:16, when a White male

---

[2] At that time, Plaintiff's chain of command was as follows: Correctional Lieutenant Clint Thrasher; Correctional Captain LaTonya Scott; Correctional Wardens Gwendolyn Givens, Phyllis Morgan, and Vencini Smith; Regional Director Edward Ellington; and Deputy Commissioner Wendy Williams. (Docs. # 41-1 at 6; 41-3 at 12:6-19; 41-4 at 85:5-86:2).

inmate wearing a face mask and gloves arrives at the door to the HCU pushing Inmate Gilchrist in a wheelchair with Plaintiff following behind. (*Id.*). Inmate Gilchrist shows signs of life at this point. (*Id.*). At approximately 00:00:23, Inmate Gilchrist slumps to his left side as the inmate attempts to push the wheelchair through the HCU door, and at approximately 00:00:42, Inmate Gilchrist slides out of the wheelchair and onto the floor in the doorway. (*Id.*). Though still showing signs of life, Inmate Gilchrist is in apparent distress. (*Id.*).

At approximately 00:00:44, a female nurse in blue scrubs walks past Inmate Gilchrist as he lies slumped in the HCU doorway without stopping to assist him. (*Id.*). No other medical personnel appear during the remainder of the video. (*Id.*). At approximately 00:01:09, Correctional Officer Edward Martin arrives at the HCU door and speaks with Plaintiff. (*Id.*). Although the White male inmate attempts to rouse Inmate Gilchrist, Plaintiff and Officer Martin made no effort to help Inmate Gilchrist up from the floor or into the HCU. (*Id.*). By approximately 00:01:43, Inmate Gilchrist displays labored breathing and is in evident distress. (*Id.*).

At approximately 00:02:29, the White male inmate attempts to lift Inmate Gilchrist from the floor and place him back in the wheelchair, while Plaintiff and Officer Martin again take no action to assist. (*Id.*). At approximately 00:02:48, a White male correctional officer[3] arrives and positions himself behind the wheelchair to prevent it from rolling away as the White male struggles to lift Inmate Gilchrist, but otherwise provides no assistance. (*Id.*). Inmate Gilchrist continues to show signs of life, though his distress remains evident. (*Id.*).

At approximately 00:03:12, Plaintiff appears to direct the White male inmate to wheel Inmate Gilchrist away from the HCU, and the inmate rolls Inmate Gilchrist out of the camera's frame with Plaintiff following behind. (*Id.*). Officer Martin and the White male correctional officer

---

[3] The court's review of the video suggests that this officer is Sergeant Shaun Mechalske, but the record does not confirm that identification with sufficient certainty. The court therefore refers to him by description only.

disperse in the opposite direction. (*Id.*). In total, Inmate Gilchrist is seen laying on the floor in the HCU doorway without receiving any assistance for approximately two minutes and nine seconds. (*Id.*).

### 2.      Security Footage from the Barbershop

A second video shows Plaintiff escorting Inmate Gilchrist to the barbershop. (Doc. # 41-7). The barbershop has four floor-to-ceiling windows beside the door, allowing those in the hallway to see inside, though most of the barbershop door itself is outside the camera's frame. (*Id.*).

At approximately 00:00:11, the White male inmate rolls Inmate Gilchrist into the barbershop with Plaintiff following behind. (*Id.*). Two other inmates who had been sitting inside the barbershop are seen leaving. (*Id.*). At approximately 00:00:36, the White male inmate who transported Inmate Gilchrist also leaves, and at approximately 00:00:41, Plaintiff closes the barbershop door, leaving Inmate Gilchrist alone inside. (*Id.*). At approximately 00:00:50, Plaintiff leaves the hallway, though the two inmates who had previously been in the barbershop remain in the hallway. (*Id.*). Plaintiff is seen briefly reentering the hallway at approximately 00:01:14, walking past the barbershop, and exiting the frame. (*Id.*). At approximately 00:03:30, Plaintiff reenters the frame, walks past the barbershop again, exchanges words with the two inmates in the hallway, and leaves. (*Id.*).

The two inmates in the hallway are shown conversing until approximately 00:24:03, when one of them walks over to the barbershop windows. (*Id.*). Although Inmate Gilchrist is not visible in the frame, a shadow indicates that he is moving inside. (*Id.*). Around this same time, a third inmate enters the hallway, and all three stand watching Inmate Gilchrist inside the barbershop. (*Id.*). At approximately 00:25:40, Inmate Gilchrist falls out of his wheelchair and onto the barbershop floor, where he is writhing as the three inmates look on. (*Id.*).

At approximately 00:26:28, Plaintiff reenters the hallway, walks past the barbershop, and leaves the frame, while Inmate Gilchrist continues to writhe on the floor. (*Id.*). At approximately 00:28:35, Plaintiff reenters the frame and one of the three inmates speaks to him beside the barbershop windows. (*Id.*). Plaintiff watches Inmate Gilchrist for a few moments before leaving the frame at approximately 00:28:51. (*Id.*). Inmate Gilchrist continues to writhe on the floor, flailing his arms. (*Id.*). Plaintiff passes the barbershop again at approximately 00:29:22, at which point the three inmates and another correctional officer are observed watching Inmate Gilchrist on the floor. (*Id.*).

At approximately 00:29:54, Plaintiff again passes the barbershop, and at approximately 00:30:45, Plaintiff returns to the hallway and opens the barbershop door. (*Id.*). Inmate Gilchrist continues to writhe on the floor as Plaintiff stands holding the door open and the three inmates are looking on. (*Id.*). At approximately 00:31:29, Plaintiff closes the door and begins watching Inmate Gilchrist through the window. (*Id.*). At approximately 00:32:10, Plaintiff opens the door again, and one of the inmates in the hallway enters the barbershop to get Inmate Gilchrist back into his wheelchair while Plaintiff stands holding the door open, making no effort to assist. (*Id.*). At approximately 00:32:46, having been unable to get Inmate Gilchrist back into the wheelchair, the inmate exits the barbershop and Plaintiff closes the door. (*Id.*). Inmate Gilchrist continues to writhe on the floor (and he is now almost fully visible in the frame) while two of the three hallway inmates leave and one remains seated in the hallway, watching. (*Id.*).

At approximately 00:33:46, Plaintiff reenters the frame and speaks with the remaining inmate in the hallway while observing Inmate Gilchrist through the barbershop windows. (*Id.*). At approximately 00:34:22, Plaintiff leaves the hallway again, returning briefly at approximately 00:34:58 to glance at Inmate Gilchrist before leaving once more. (*Id.*). Inmate Gilchrist continues

to writhe on the floor, flailing his arms and legs, as various correctional officers, including Sergeant Shaun Mechalske, pass by the barbershop windows without intervening. (*Id.*).

At approximately 00:45:03, after lying on the barbershop floor without meaningful assistance for approximately nineteen minutes and twenty-three seconds, Inmate Gilchrist stops moving. (*Id.*). No one enters the barbershop until approximately 00:58:43, when Sergeant Mechalske enters and attempts to rouse him, shortly after which the video ends. (*Id.*). By that point, Inmate Gilchrist had been on the barbershop floor for over thirty-three minutes. (*Id.*).

### 3.    LESD's Interviews

On the date of the incident, Plaintiff was interviewed by agents from LESD. (Doc. # 41-5 at 3). Plaintiff gave this account of the event: He responded to the Y-Unit where he found Inmate Gilchrist laying on the floor and placed him in a wheelchair to be transported to the HCU. (*Id.*). During transport, Inmate Gilchrist was uncooperative and unresponsive, placing his feet on the ground and sliding out of the wheelchair. (*Id.*). Although Plaintiff was able to escort Inmate Gilchrist from the Y-Unit to the door of the HCU, Inmate Gilchrist "refused" to enter. (*Id.*). Despite a directive prohibiting inmates from being left in the barbershop, Plaintiff instructed that Inmate Gilchrist be left there in the wheelchair until he decided to cooperate, and then left to assist a fellow supervisor at another unit. (Docs. # 41-2 at 2; 41-5 at 3). Plaintiff later heard Sergeant Mechalske over the radio calling for a stretcher and nurse to the West door of the Shift Office, and upon returning to the HCU, he found medical staff performing CPR on Inmate Gilchrist. (Doc. # 41-5 at 3).

Sergeant Shaun Mechalske, a White male, was also interviewed by LESD. (Doc. # 41-5 at 4). Sergeant Mechalske has been employed with ADOC since July 2011 and was assigned to WEDCF. (*Id.* at 2). Sergeant Mechalske stated that he discovered Inmate Gilchrist unresponsive on the floor of the barbershop. (*Id.* at 4). After entering the barbershop and attempting to rouse

6

Inmate Gilchrist by tapping him on the shoes and shoulder without success, Sergeant Mechalske had other inmates help place Inmate Gilchrist in a wheelchair and transported him to the HCU. (*Id.*). Sergeant Mechalske stated that while Inmate Gilchrist was still breathing when he was found in the barbershop, he had stopped breathing by the time they reached the HCU. (*Id.*). Sergeant Mechalske reported observing no wounds on Inmate Gilchrist's body. (*Id.*). When asked whether he knew anything further about the incident, Sergeant Mechalske stated that he had been told Inmate Gilchrist had been placed in the barbershop because he was acting out and appeared to be in an altered state. (*Id.*).

On February 3, 2022, LESD conducted a follow-up interview with Plaintiff. (Doc. # 41-5 at 15). When the LESD agent met with Plaintiff, he advised that he had a pending Pre-Dismissal Hearing and asked whether providing a statement might help him return to work. (*Id.*). The LESD agent explained that the investigation was separate from the disciplinary process and that providing a statement would have no bearing on the outcome of the disciplinary proceedings against him. (*Id.*). After being so informed, Plaintiff declined to give a statement. (*Id.*).

Plaintiff did not inform LESD in either of his interviews that Sergeant Mechalske directed him to place Inmate Gilchrist in the barbershop. (*See id.*). During his deposition in this case, however, Plaintiff testified that when Inmate Gilchrist "refused" to go into the HCU, "[Sergeant] Mechalske steps out onto the hallway and says, 'Just put him in the barbershop.'" (Doc. # 41-3 at 15:5-20).

Also on February 3, 2022, LESD interviewed other corrections officers about the October 11, 2021 incident. (Doc. # 41-5 at 16). Officer Ruston Greer stated that he recalled Sergeant Mechalske directing that Inmate Gilchrist be placed in the barbershop after Inmate Gilchrist was moved away from the door to the HCU. (*Id.*). Specifically, Officer Greer explained that after

Inmate Gilchrist was placed back into the wheelchair, Sergeant Mechalske directed staff to take Inmate Gilchrist to the barbershop, stating that since Inmate Gilchrist did not want to go to the HCU, he should be placed in the barbershop. (*Id.*). Officer Greer stated that the only instructions he recalled at that time were to put Inmate Gilchrist in the barbershop. (*Id.*).

Officer Edward Martin reported that after witnessing an altercation involving Inmate Gilchrist, he called for a wheelchair and informed Plaintiff upon his arrival that Inmate Gilchrist had been involved in an altercation and needed to be taken to the HCU. (Doc. # 41-5 at 17-19). Plaintiff and another inmate loaded Inmate Gilchrist into the wheelchair and transported him to the HCU, where Inmate Gilchrist fell out of the wheelchair at the door. (*Id.*). Officer Martin informed both Plaintiff and Sergeant Mechalske about the altercation, telling them two or three times that Inmate Gilchrist needed to be examined. (*Id.*). Officer Martin stated that Plaintiff and Sergeant Mechalske debated whether to take Inmate Gilchrist into the HCU while Officer Martin continued to urge them to do so. (*Id.*). When a nurse directed that Inmate Gilchrist needed to be brought inside the HCU, Plaintiff responded that he would wait until Inmate Gilchrist calmed down to take him in. (*Id.* at 19). When asked whether Inmate Gilchrist appeared to be in distress, Officer Martin stated it was hard to say, but that the nature of the incident was enough for him to believe Inmate Gilchrist needed medical attention. (*Id.*).

Officer Martin stated that his concerns about Inmate Gilchrist not being taken to the HCU prompted him to visit the Shift Office multiple times to urge Plaintiff and Sergeant Mechalske to have Inmate Gilchrist seen by medical personnel. (*Id.*). Officer Martin noted that the barbershop and the Shift Office are separated by a large window, allowing him to see Inmate Gilchrist laying on the floor of the barbershop during his visits to the Shift Office. (*Id.*). Despite Officer Martin's repeated urging, Sergeant Mechalske never left the Shift Office, and while Plaintiff eventually

stood up and appeared to go check on Inmate Gilchrist, Officer Martin concluded he was not making progress and left to find a lieutenant to raise his concerns. (*Id.*). Shortly after, Officer Martin heard a call for a wheelchair, returned to the Shift Office, and upon his return was directed to retrieve the inmate involved in the altercation with Inmate Gilchrist. (*Id.*).

### 4.    LESD's Findings

The Jefferson County, Alabama Morgue performed an autopsy of Inmate Gilchrist, which revealed a stab wound on the left side of his chest that had caused injury to his pulmonary trunk and left lung. (*Id.* at 5). Toxicology results confirmed the presence of amphetamines and/or methamphetamines in his system, and the manner of death was determined to be homicide. (*Id.*).

Upon concluding their investigation, LESD determined that both Plaintiff and Mechalske had failed to discharge their duties by making no effort to obtain medical assistance for Inmate Gilchrist. (Docs. # 41-1 at 6; 41-5 at 20; 41-8 at 13-16). Specifically, LESD found probable cause to believe that Plaintiff and Sergeant Mechalske denied Inmate Gilchrist medical care by not making any effort to assist him as he lay on the floor in apparent distress, exhibiting signs including being slumped over, unable to support himself, and labored breathing. (Doc. # 41-5 at 20). LESD further found that Plaintiff and/or Sergeant Mechalske directed that Inmate Gilchrist be removed from the door of the HCU until he decided to cooperate, after which Inmate Gilchrist was left in the barbershop. (*Id.*).

### B.    ADOC's Personnel Actions against Plaintiff

Plaintiff was placed on mandatory leave with pay on October 13, 2021, two days after the October 11, 2021 incident. (Doc. # 42-1 at 11). On November 4, 2021, Warden Gwendolyn Givens recommended Plaintiff for a pre-dismissal conference. (Doc. # 42-1 at 7). Specifically, Warden Givens found that Plaintiff failed to ensure Inmate Gilchrist received medical attention after he was stabbed and, after reviewing the video footage, determined that Plaintiff had provided false

information in connection with the investigation. (*Id.* at 7-9).

On January 18, 2022, Plaintiff appeared with his attorney at a pre-dismissal conference before Warden Phyllis Morgan at WEDCF. (Doc. # 41-2 at 4-6). Plaintiff stated that when he arrived at the Y-Unit, Officer Martin told him only that Inmate Gilchrist was intoxicated or "wigging out," and did not inform him that Inmate Gilchrist had been stabbed. (*Id.*). Plaintiff stated that he transported Inmate Gilchrist to the HCU door, but that Inmate Gilchrist was combative and resistant to entering, and that because Plaintiff did not have his proper equipment, he was concerned a physical altercation would occur if he forced Inmate Gilchrist inside. (*Id.*).

Plaintiff admitted that he instructed staff to take Inmate Gilchrist to the barbershop, where Inmate Gilchrist subsequently slumped out of the wheelchair, began flailing on the floor, and struck his mouth on the wall causing bleeding. (*Id.*). Plaintiff stated that after a canteen worker alerted him that Inmate Gilchrist was injuring himself, Plaintiff had the worker move Inmate Gilchrist to the center of the floor. (*Id.*). Plaintiff acknowledged that even if an inmate appeared to be under the influence, policy required that the inmate be taken to the HCU and admitted that he did not attempt to have medical staff come to Inmate Gilchrist after Inmate Gilchrist refused to enter the HCU. (*Id.*). Plaintiff maintained that he felt he had done nothing wrong and noted that placing inmates in the barbershop was a common practice. (*Id.*).

Following the conference, Warden Morgan recommended that Plaintiff's dismissal be upheld. (*Id.*). On February 7, 2022, Plaintiff submitted his resignation via email, effective February 7, 2022. (Doc. # 42-1 at 10). In his resignation letter, Plaintiff stated that "[i]t has been a pleasure working with the administration and the entire Department" and thanked ADOC for "providing [him] with a rewarding learning experience." (*Id.*). When asked at his deposition why he resigned rather than waiting for the outcome of his pre-dismissal conference, Plaintiff testified that he

resigned because he was on mandatory leave without overtime pay, was in financial "limbo," could not take outside employment while remaining on ADOC's rolls, and needed to support his household. (Doc. # 41-3 at 27:1-9). Plaintiff was not recommended for reemployment. (Doc. # 42-1 at 1).

Plaintiff testified that he did not appeal his dismissal to the state personnel department or file a grievance with ADOC. (Doc. # 41-3 at 27:18-28:9). He also did not file a harassment and discrimination complaint with ADOC under their regulations. (*Id.*). Plaintiff had informal conversations with Captain Deondre Johnson while on mandatory leave, during which Plaintiff expressed a general belief that discipline was being applied unevenly because he alone had been placed off work while Sergeant Mechalske, Lieutenant Thrasher, and Captain Scott faced no consequences. (Doc. # 41-3 at 38:16-39:1, 41:6-21). Plaintiff's first formal complaint of discrimination was filed directly with the Equal Employment Opportunity Commission ("EEOC") after his resignation, and he received his Right to Sue letter on September 6, 2024. (Doc. # 3-1).

## C.    ADOC's Personnel Actions against Sergeant Mechalske

Sergeant Mechalske was placed on mandatory leave on April 11, 2022. (Doc. # 42-2 at 9). On April 12, 2022, Warden Phyllis Morgan recommended Sergeant Mechalske for a pre-dismissal conference. (Doc. # 42-2 at 10). Specifically, Warden Morgan found that Sergeant Mechalske failed to ensure Inmate Gilchrist received medical attention after he was stabbed. (*Id.* at 10-12).

On June 1, 2022, Sergeant Mechalske appeared at a pre-dismissal conference before Warden Morgan at WEDCF. (Doc. # 42-2 at 14-16). Sergeant Mechalske stated that on the date of the incident he was shift clerking and, upon hearing commotion in the hallway, came out of the shift office and observed Plaintiff arguing with Inmate Gilchrist in front of the door to the HCU. (*Id.*). Sergeant Mechalske stated that Plaintiff told him Inmate Gilchrist did not want to go to the HCU, and that he told Plaintiff to place Inmate Gilchrist in the barbershop until he calmed down

11

so they could find out what was going on. (*Id.*). Sergeant Mechalske acknowledged that he was the senior sergeant on duty but stated that he assumed Plaintiff was handling the situation because Plaintiff had responded to the initial incident. (*Id.*).

When questioned about Officer Martin's repeated attempts to get medical attention for Inmate Gilchrist, Sergeant Mechalske stated that he was aware Officer Martin had advised that Inmate Gilchrist could not return to the block due to problems with other inmates, but claimed he did not recall being approached multiple times about getting Inmate Gilchrist medical attention. (*Id.*). Sergeant Mechalske stated that he finally went to check on Inmate Gilchrist when he learned the inmate was lying on the floor unresponsive, and that when he checked on him, he observed no visible injuries or blood. (*Id.*). When confronted with video surveillance showing blood on Inmate Gilchrist's chest, Sergeant Mechalske stated he had assumed any blood was from Inmate Gilchrist's face and did not investigate further. (*Id.*). Sergeant Mechalske acknowledged in hindsight that, as the senior sergeant, he should have investigated the incident more thoroughly and taken over responsibility for ensuring Inmate Gilchrist received medical attention. (*Id.*).

Following the conference, Warden Morgan found that Sergeant Mechalske's dismissal was warranted because Sergeant Mechalske had admitted to being the senior sergeant on duty, had given instructions to place Inmate Gilchrist in the barbershop, had failed to observe or investigate visible injuries, and had neglected his duties as a senior sergeant by failing to ensure Inmate Gilchrist received adequate medical attention. (*Id.*). Effective July 29, 2022, Sergeant Mechalske was dismissed from state service. (Doc. # 42-2 at 2-4). He was not recommended for reemployment. (*Id.* at 1).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of a material fact. *See id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could [find] for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

"[A]t the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1381 (S.D. Fla. 1999)

("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Analysis

Plaintiff's Second Amended Complaint asserts three claims against ADOC: (1) Title VII Racial Discrimination, (2) Title VII Retaliation, and (3) Violation of 42 U.S.C. § 1983 and the Fourteenth Amendment. (Doc. # 28 ¶¶ 14-22). The court addresses each of Plaintiff's claims in turn.

### A.    Title VII Racial Discrimination

In employment discrimination cases, courts have historically applied the *McDonnell Douglas* burden shifting framework. *McDonnell Douglas Co. v. Green*, 411 U.S. 792 (1973). However, in recent years our circuit has made clear that the *McDonnell Douglas* model is not the exclusive method for evaluating a summary judgment motion. *Ismael v. Roundtree*, 161 F.4th 752, 763-64 (11th Cir. 2025); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Regardless of whether a plaintiff can satisfy the *McDonnell Douglas* model, the court must still consider whether the record as a whole presents a "convincing mosaic" of circumstantial evidence from which a reasonable jury could infer intentional discrimination. *Id.*

The convincing mosaic standard states that a "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328. "[The Eleventh Circuit] has used the phrase 'convincing mosaic' simply to recognize that courts must consider the totality of a plaintiff's circumstantial evidence on summary judgment." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023). "A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action – the ultimate inquiry in a

14

discrimination lawsuit." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023). "That evidentiary picture may include, 'among other things,' (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling*, 82 F.4th at 1342 (citing *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)).

Plaintiff cannot satisfy either the *McDonnell Douglas* framework or the convincing mosaic standard. His racial discrimination claim rests on a single contention: that he, a Black employee, was disciplined before Sergeant Mechalske, a White employee. The record forecloses any inference of discrimination, however, because the difference in timing was a direct consequence of Plaintiff's own conduct.

The facts are straightforward and undisputed. Plaintiff was placed on mandatory leave two days after the October 11, 2021 incident and appeared at his pre-dismissal conference on January 18, 2022. (Doc. # 42-1 at 7, 11). Sergeant Mechalske was not placed on mandatory leave until April 11, 2022, with his pre-dismissal conference following on June 1, 2022. (Doc. # 42-2 at 9-10). But, when LESD interviewed Plaintiff on the date of the October 11, 2021 incident, Plaintiff said nothing about Sergeant Mechalske having directed him to place Inmate Gilchrist in the barbershop, and when given a second opportunity on February 3, 2022, Plaintiff declined to give any statement at all. (Doc. # 41-5 at 15). It was only through LESD's February 3, 2022 interviews of Officers Greer and Martin that ADOC learned of Sergeant Mechalske's involvement in the matter. (Doc. # 41-5 at 16-19). And, as soon as Sergeant Mechalske's involvement was discovered, ADOC initiated disciplinary proceedings against him. ADOC cannot be faulted for failing to act sooner against Sergeant Mechalske when Plaintiff chose to withhold information indicating his involvement in the incident.

Apart from timing, the two officers were treated the same in every material respect. Both were placed on mandatory leave, both appeared before the same warden at pre-dismissal conferences held at the same facility, both were found to have neglected their duties in connection with the same incident, and neither was recommended for reemployment. (Docs. # 42-1 at 1; 42-2 at 1-4). That Plaintiff resigned before a formal dismissal issued while Sergeant Mechalske was formally dismissed reflects Plaintiff's own choice, not any preferential treatment afforded to Sergeant Mechalske.

The Rule 56 record before the court contains no suspicious statements, no pattern of favorable treatment toward White employees, and no comparator who was treated more favorably under similar circumstances. The only distinction Plaintiff identifies is the sequence of discipline, and that sequence is explained by Plaintiff's own decision to withhold information from investigators. These facts do not present a convincing mosaic of intentional discrimination. ADOC is therefore entitled to summary judgment on Plaintiff's Title VII racial discrimination claim.

### B.    Title VII Retaliation

Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

16

**1. Plaintiff participated in a protected activity but cannot establish a causal connection**

An employee satisfies the protected activity element of a retaliation claim if he (1) has opposed any practice made an unlawful employment practice by Title VII or (2) has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a).

The causal connection element of a *prima facie* case is broadly construed. A plaintiff must establish "the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). "As a starting point for any retaliation claim, a plaintiff needs to show (among other things) that the decisionmaker actually knew about the employee's protected expression." *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020); *see also Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002); *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him."). Awareness of protected activity can be established through circumstantial evidence. *Martin*, 959 F.3d at 1053.

Plaintiff engaged in protected activity when he filed his EEOC charge. *See* 42 U.S.C. § 2000e-3(a). But, because Plaintiff did not file his EEOC charge until after he had already resigned, any employment action ADOC took against him necessarily predated his protected activity and therefore cannot serve as the basis for a retaliation claim. *See id*.

Plaintiff's remaining allegations about his purported protected activity fare no better. Before filing his EEOC charge, Plaintiff's only "complaints" consisted of informal conversations with Captain Johnson, which took place while he was on mandatory leave, and during which he expressed a general belief that discipline was being applied unevenly. (Doc. # 41-3 at 38:16-39:1,

17

41:6-21). Plaintiff never reported discrimination through ADOC's internal channels. (Doc. # 41-3 at 27:18-28:9). There is no evidence that either Warden Givens or Warden Morgan was ever made aware of Plaintiff's conversations with Captain Johnson prior to the pre-dismissal conference. Obviously, a decisionmaker cannot retaliate against an employee for activity unknown to her. *Martin*, 959 F.3d at 1053; *Shannon*, 292 F.3d at 716; *Brungart*, 231 F.3d at 799. Plaintiff's retaliation claim therefore fails on this threshold issue.

### 2.      Plaintiff has not shown that he suffered an adverse employment action

Even assuming Plaintiff's informal complaints to Captain Johnson constituted protected activity under Title VII, it is not at all clear he suffered an adverse employment action. An adverse employment action is an action that "produces an injury or harm" and would dissuade a reasonable worker from engaging in protected conduct. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006). Plaintiff's briefing is far from clear. He appears to contend that he was constructively discharged.[4]

Under Title VII, a constructive discharge is tantamount to an actual discharge, so it constitutes an adverse employment action. *Green v. Brennan*, 578 U.S. 547, 555, 560 (2016) ("The whole point of allowing an employee to claim 'constructive' discharge is that in circumstances of discrimination so intolerable that a reasonable person would resign, we treat the employee's resignation as though the employer actually fired him."); *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1300-01 (11th Cir. 2005) ("Constructive discharge negatively affects an employee's job status, and therefore constitutes an adverse employment action."). Constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the

---

[4] Under certain circumstances, an investigation and suspension pending investigation may be retaliatory. But here, Plaintiff either is not making that contention or has not supported it. He was paid while on leave and this situation obviously required an investigation and, with a death of an inmate, there was much to investigate.

employee is forced to quit his job. *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009). A constructive discharge claim has "two basic elements: discrimination and discharge." *Green*, 578 U.S. at 555-56.

"[E]mployee resignations are presumed to be voluntary." *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) (citing *Angarita v. St. Louis Cnty.*, 981 F.2d 1537, 1544 (8th Cir. 1992); *Alvarado v. Picur*, 859 F.2d 448, 453 (7th Cir. 1988); *Christie v. United States*, 518 F.2d 584, 587 (1975)). "[R]esignations can be voluntary even where the only alternative to resignation is facing possible termination for cause" because the employee had a choice. *Id.* (citing *Pitt v. United States*, 420 F.2d 1028 (1970)).[5]

The most straightforward evidence of voluntariness is Plaintiff's own testimony and resignation letter. When asked at his deposition why he resigned rather than waiting for the outcome of his pre-dismissal conference, Plaintiff testified that he resigned because he was on mandatory leave without overtime pay, was in financial "limbo," could not take outside employment while remaining on ADOC's rolls, and needed to support his household. (Doc. # 41-3 at 27:1-9). Plaintiff's resignation letter told the same story. Rather than describing intolerable working conditions, Plaintiff wrote that "[i]t has been a pleasure working with the administration and the entire Department" and thanked ADOC for "providing [him] with a rewarding learning experience." (Doc. # 42-1 at 10). That language is fundamentally incompatible with a claim that discriminatory conditions were so unbearable that a reasonable person would have felt compelled to resign.

---

[5] Plaintiff cites *Thomas v. Dillard Dep't Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997), and attributes to it the following quotation: "'Resign or be fired' scenarios are classic jury questions." (Doc. # 48 at 15-16). The court's own review of *Thomas* reveals that no such language appears anywhere in that opinion. The court declines to speculate as to how this misattribution occurred, but counsel is cautioned that submitting fabricated quotations to the court implicates her obligations under Federal Rule of Civil Procedure 11 and that such conduct will not be tolerated in future filings. *See, e.g.*, *Johnson v. Dunn*, 792 F. Supp. 3d 1241 (N.D. Ala. 2025).

Plaintiff also cannot establish that ADOC acted deliberately to force his resignation. ADOC initiated disciplinary proceedings against Plaintiff because he violated Warden Givens's directive by placing Inmate Gilchrist in the barbershop following an altercation and failed to obtain medical attention for a stabbing victim – indeed, a stabbing victim who died. (Docs. # 41-2 at 1-2; 41-7; 42-1 at 7-9). And, once ADOC belatedly became aware of Sergeant Mechalske's involvement in the same incident, it instituted the same disciplinary proceedings that were instituted against Plaintiff. Thus, the Rule 56 record contains no evidence that ADOC pursued discipline for any reason other than Plaintiff's own documented misconduct.

Finally, even if Plaintiff believed his only options were to resign or be terminated, that does not make his resignation involuntary. The Eleventh Circuit has held that resignations remain voluntary even when the alternative is termination for cause, because the employee still has a choice. *Hargray*, 57 F.3d at 1568. Plaintiff made that choice and expressed satisfaction with his employer on his way out the door. Because Plaintiff has failed to establish either element of a constructive discharge claim, he cannot establish that he suffered an adverse employment action.

There is no Rule 56 evidence of retaliation against Plaintiff. Thus, ADOC is entitled to summary judgment on Plaintiff's Title VII retaliation claim.

### C.    Violation of 42 U.S.C. § 1983 and the Fourteenth Amendment

To succeed on a claim under § 1983, a plaintiff must prove "(1) that the conduct complained of was committed by a *person* acting under color of state law; and (2) that the conduct deprived a person of rights secured by the Constitution or laws of the United States." *Morrison v. Washington Cnty.*, 700 F.2d 678, 682 (11th Cir. 1983) (emphasis added). However, ADOC's immunity from this claim operates on two independent and well-established grounds.

First, as a state agency, ADOC is not a "person" subject to suit under § 1983. It is well-settled that any claim against a state actor for a § 1981 violation must be asserted under § 1983.

20

*Bryant v. Jones*, 575 F.3d 1281, 1288 n. 1 (11th Cir. 2009). But, ADOC is an arm of the State of Alabama and is therefore a state agency. *See Ross v. Jefferson Cnty. Dep't of Health*, 701 F.3d 655, 661 (11th Cir. 2012); *Rizo v. Ala. Dep't of Hum. Res.*, 228 F. App'x 832, 834-35 (11th Cir. 2007). A state agency like ADOC is not a "person" subject to suit under § 1983. *Lapides v. Bd. of Regent*s, 535 U.S. 613, 617 (2002); *Carr v. Bd. of Regents of the Univ. Sys.*, 249 F. App'x 146, 148 (11th Cir. 2007).

Second, and separately, ADOC is immune from suit under § 1983 under the Eleventh Amendment. The Supreme Court has held that Eleventh Amendment immunity bars § 1983 claims against state governmental entities in federal court because Congress did not clearly intend to abrogate that immunity when it enacted § 1983. *See Quern v. Jordan*, 440 U.S. 332, 345 (1979).

Plaintiff's attempt to reframe his § 1983 claim by focusing on the conduct of Commissioner Hamm does not salvage his claim against ADOC. (*See* Doc. # 48 at 11). Commissioner Hamm is not a named defendant in this action (*see generally* Doc. # 28), and Plaintiff cannot circumvent ADOC's immunity simply by attributing the challenged employment decision to an individual state official who was never named or served in this proceeding. The relevant inquiry under § 1983 is not whether a particular official acted appropriately, but whether the *named* defendant qualifies as a suable "person" under the statute. *See Lapides*, 535 U.S. at 617; *Carr*, 249 F. App'x at 148. The named defendant, ADOC, does not. These are threshold legal bars that exist independent of, and are wholly unaffected by, the underlying facts Plaintiff contends support his claim. Accordingly, Plaintiff's § 1983 claim is due to be dismissed.

## IV.     Conclusion

For all the above reasons, ADOC's Motion for Summary Judgment is due to be granted. A separate order will be entered.

**DONE** and **ORDERED** this April 28, 2026.

**R. DAVID PROCTOR**
SENIOR U.S. DISTRICT JUDGE